**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DARRELL R. ZIBBLE,

                *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL
SECURITY,

                *Defendant*.
_____/

CASE NO. 2:18-cv-12910

DISTRICT JUDGE VICTORIA A. ROBERTS
MAGISTRATE JUDGE PATRICIA T. MORRIS

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON**
**CROSS MOTIONS FOR SUMMARY JUDGMENT (R. 14, 15)**

## I.  RECOMMENDATION

Plaintiff Darrell Zibble challenges Defendant Commissioner of Social Security's final decision denying his claim for Title II Disability Insurance Benefits (DIB). The case was referred to me for review. (R. 4.); *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3), For the reasons below, I conclude that substantial evidence supports the Commissioner's decision. Accordingly, I recommend **DENYING** Zibble's Motion for Summary Judgment, (R. 14), **GRANTING** the Commissioner's Motion, (R. 15), and **AFFIRMING** the Commissioner's final decision.

## II.  REPORT

### A.  Introduction and Procedural History

Zibble applied for DIB in August 2015, alleging he had become disabled a few

1

months earlier, in May. (R. 11, PageID.115, 148.)[1] After the Commissioner initially denied the claim, Zibble requested and received a hearing before an administrative law judge (ALJ). (*Id.*, PageID.66-104, 115.) On April 18, 2018, the ALJ issued a decision rejecting Zibble's claim. (*Id.*, PageID.46-47.) The Appeals Council declined to review that decision, and Zibble subsequently sought judicial review of the agency's action. (*Id.*, PageID.36; R. 1.) The parties have exchanged motions for summary judgment, briefing has concluded, and the matter is now ready for resolution. (R. 14-16.)

**B.  Standard of Review**

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

---

[1] It has become common for the administrative record to contain multiple application dates. *See, e.g.*, *Charbonneau v. Comm'r of Soc. Sec.*, No. 2:18-cv-10112, 2019 WL 960192, at *1 n. 2 (E.D. Mich. Jan. 11, 2019), *rep. & rec. adopted by* 2019 WL 952736 (E.D. Mich. Feb. 27, 2019). In the present case, for example, the actual application gives December 23, 2015, as the date, while the letter denying benefits, the ALJ's decision, and both parties' briefs provide a date four months earlier. (R. 11, PageID.46, 115, 205; R. 14, PageID.682; R. 15, PageID.703.) The distinction has no effect here—except to vex readers of the record—and so I will use the consensus date.

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

3

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)). The RFC "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20

4

C.F.R. § 404.1545(a)(2).

### D.  ALJ Findings

At step one of the sequential analysis, the ALJ found that Zibble had not engaged in substantial gainful activity since he allegedly had become disabled. (R. 11, PageID.48.) At step two, the ALJ concluded that Zibble had the following severe impairments: "cervical spine degenerative disc disease, bilateral knee degenerative joint disease, diabetes mellitus with neuropathic arthropathy, sleep apnea, and obesity." (*Id.*) At step three, the ALJ decided these impairments did not meet or equal a listed impairment. (*Id.*, PageID.50-51.)

Before proceeding to the final steps, the ALJ found that Zibble had the RFC to perform

> light work as defined in 20 CFR 404.1567(b) except the claimant can frequently handle and finger with both upper extremities. The claimant can frequently push or pull and reach overhead with the right upper extremity. Moreover, the claimant can frequently push, pull, or operate foot controls with the lower extremities. The claimant can frequently balance, occasionally kneel, crouch, stoop, and crawl, as well as occasionally climb stairs and ramps but never climb ladders, ropes, or scaffolds. Finally, the claimant can never have exposure to vibrations, unprotected heights, and moving machinery parts.

(*Id.*, PageID.51.) At step four, the ALJ concluded that Zibble could perform his past relevant work; consequently, the ALJ did not reach step five. (*Id.*, PageID.51.)

### E.  Administrative Record

#### 1.  Medical Evidence

I have reviewed the medical records and will discuss them as necessary in the analysis below.

### 2. Adult Function Report

Zibble completed a function report on January 14, 2016, as part of his DIB application. (*Id.*, PageID.270-77.) In it, he claimed that torn tendons in his left knee made standing difficult, as did the diabetic neuropathy affecting both his feet; cervical spine issues caused pain and reduced his neck's range of motion; migraines struck at least once per week; his type-2 diabetes remained uncontrolled; and he had sleep apnea. (*Id.*, PageID.270.) There was "not a lot" he could do on a typical day, depending on how he felt. (*Id.*, PageID.271.) His physical conditions had robbed him of the ability to play sports, complete yardwork, and do "heavy lifting." (*Id.*) They also disturbed his sleep. (*Id.*)

As for personal care, he "[n]eed[ed] help with clothing over neck & shoulders on & off," with hair care, and with putting on his shoes. (*Id.*) But he did not require any reminders to maintain his personal care, though he needed assistance keeping his medicine in order. (*Id.*, PageID.272.) He could prepare his own meals using the microwave or crock pot, but it took "twice as long as it used to" and he was unable to "cook full meals at one time."(*Id.*) Around the house, he could fold laundry and do "small things as long as not reaching over head or bending over," although it took "longer than normal" depending "on [the] day and how I feel." (*Id.*) Encouragement helped him finish housework because he would "get frustrated." (*Id.*) When he felt well enough he ventured outside, sometimes alone, and he could walk, drive, or ride in a car. (*Id.*, PageID.273.) When necessary, he shopped in stores or by computer for basic goods. (*Id.*) Handling money—*e.g.*, paying bills, counting change, using checks or money orders, and managing a savings account—presented no difficulties. (*Id.*) Hobbies included woodworking, fishing, hunting, and sports, although he rarely did

6

these activities and had completely given up sports. (*Id.*, PageID.274.) When he tried to engage in his hobbies, he had to "stop & start later all the time." (*Id.*)

Zibble provided a detailed breakdown of how his conditions affected his abilities: he could lift 5 to 8 pounds, sit for 25 minutes, stand or walk for 10 minutes on average (but depending on the day he could walk for up to 3 hours), and climb 6 steps; pain and dizziness affected squatting and bending; he could not kneel; he was sensitive to light, so his vision was affected; and pain and medication affected his memory, concentration, and ability to follow instructions. (*Id.*, PageID.275.) His attention span varied from 1 to 30 minutes, although he finished what he started. (*Id.*) Following written instructions "might take a couple of days on average," and he managed to follow verbal instructions "okay — on good days" but "not at all" on bad ones. (*Id.*) He could not handle stress "at all anymore," and he tolerated changes to his routine "ok" on some days but on others "not at all." (*Id.*, PageID.276.) A knee brace was prescribed sometime around 2000 to help him walk on uneven or slippery surfaces. (*Id.*, PageID.276.) Finally, he listed the four medications he took—Paxil, "neurotin," Gemfibrozil, and Imitrex—which made him sleepy, dizzy, and queasy. (*Id.*, PageID.277.)

Zibble's wife also filled out a function form on his behalf. (*Id.*, PageID.258.) Her comments reiterated many points in Zibble's form. She added that the torn tendons in his left knee caused a limp and his diabetes made him moody. (*Id.*) Additionally, he could no longer help with "normal household chores," do yardwork, play sports, or "maintain the vehicles." (*Id.*, PageID.259.) Yet she also stated that "[h]e folds laundry if I put it on the table, pulls weeds from my rose garden if he is not sitting in the sun." (*Id.*, PageID.260.)

7

As for the encouragement required to get him through these tasks, it was "mostly companionship" that he needed. (*Id.*) Bending over was painful and dizzying. (*Id.*) He cooked daily, but could not stand long enough to "prepare a full meal." (*Id.*) Her assessment of Zibble's abilities was mostly the same as his, although she thought he also struggled with completing tasks and "[u]nderstanding." (*Id.*, PageID.263.)

She elaborated a bit on Zibble's jaunts outside the house: he rarely took them (once or twice a day if able) and his driving was limited to "about twice a week." (*Id.*, PageID.261.) Shopping, either in store or by computer, was likewise limited. (*Id.*) He still liked to hunt, fish, and do woodworking, but he rarely felt well enough to. (*Id.*, PageID.262.) Other than doctor appointments, he made no regular trips. (*Id.*)

### 3. Administrative Hearing

At the hearing on November 9, 2017, Zibble discussed his former job as a "route driver." (*Id.*, PageID.73.) During that time, he twice injured his knee, which suffered tendon damage and had arthritis. (*Id.*, PageID.73, 86.) He was told that a third such injury would lead to knee replacement surgery. (*Id.*, PageID.73.) Thus ended his driving career. (*Id.*)

The persisting pain and stiffness forced him to rely more on his right knee, which then would "give[] out . . . without any warning." (*Id.*, PageID.86.) Consequently, about a week before the hearing he had asked Dr. Michael Papenfuse whether a cane would help. (*Id.*) The doctor informed Zibble that he would need to see another physician for a prescription, and that it was easier just to buy a cane on his own. (*Id.*, PageID.87.) Dr. Papenfuse recommended using a cane "on uneven ground or when I feel dizzy,

lightheaded," Zibble said. (*Id.*) After this conversation, he had begun using the cane. (*Id.*, PageID.86.)

Dr. Papenfuse had also indicated in a written opinion that Zibble was not "in an off work status." (*Id.*, PageID.87.) But, Zibble explained, the doctor "told me that he could not . . . mark that because he wasn't the one who put me off of work. So he said he couldn't mark that question." (*Id.*) The doctor had also observed that "methadone may cause sedation." (*Id.*, PageID.88.)

From 2002 until 2006 he worked as a Budweiser salesman. (*Id.*, PageID.69.) In that position, he "took orders, handled rotation of product to customers, and on Fridays we would have to go out and deliver any orders that were called in that people needed product or any special services." (*Id.*) On the job, he spent about one-third of the day walking and one-third driving, and the heaviest object he had to lift was a 175-pound keg. (*Id.*, PageID.69-70.) Stooping and crouching were required. (*Id.*, PageID.70.)

Beginning in 2008, he owned a party store, where he operated the cash register, handled hiring decisions, worked the floor, and did other "office work and ordering." (*Id.*, PageID.70) Occasionally, he would carry a case of beer for a customer; otherwise, the job required little lifting or bending. (*Id.*, PageID.71.) While working the floor, he mostly walked; while taking care of managerial duties, he mostly sat. (*Id.*, PageID.71-72.) Usually he had a worker stock the shelves. (*Id.*, PageID.72.) One of the "main reasons" for the business's shuttering was his poor health. (*Id.*, PageID.84.) Specifically, he stated, "[b]etween the diabetes, and the migraines, and the neck pain, and the arm pain, I missed more time . . . . I could not be there." (*Id.*, PageID.85.)

9

Because his blood sugar levels were hard to control, he participated in a diabetes test program that was "helping me a lot," despite some lingering problems. (*Id.*, PageID.74-75.) Still, he had neuropathy in his fingers and feet, making it difficult to grip objects and painful to walk. (*Id.*, PageID.76.)

He maintained a woodshop where he did "craftwork" for his wife, making items like small jewelry boxes. (*Id.*, PageID.77.) He would cut and glue pieces of wood, but neuropathy caused him to drop items and on one occasion he had shot a nail through his thumb without realizing it at first. (*Id.*, PageID.77-78.) Cuts would similarly go unnoticed until blood started dripping. (*Id.*, PageID.78.) Overall, he felt "very, very uncomfortable with it [presumably woodworking] because I can't do the things that I used to be able to do." (*Id.*)

Problems with vertebra and arthritis in his neck also caused migraines and pain that radiated to his shoulder and arm. (*Id.*) Consequently, he could not "carry stuff or lift stuff," or "reach up over my head even to get like some coffee down off the shelf . . . without hurting myself." (*Id.*) His doctor had advised against lifting more than 5 pounds with his right arm or 10 with his left. (*Id.*, PageID.79.) Recently, he was told that he had lost all reflexes in his right forearm. (*Id.*, PageID.79-80.) On a scale from 1 to 10, his daily pain rated at 7.5 to 8. (*Id.*, PageID.81.) Surgery was a possibility, but it would only "clean everything up and fuse it," leaving Zibble still in pain for rest of his life. (*Id.*)

To help at home, he loaded the dishwasher. (*Id.*, PageID.88.) But this required him to first line up the dishes on the counter. Then he would open the dishwasher. Once everything was in place, he sat on the floor and reached the dishes with his left arm, placing

them in the dishwasher. (*Id.*) This system spared him from having to bend over and risk passing out. (*Id.*, PageID.89.)

The ALJ inquired into Zibble's pain medications and their side effects. (*Id.*, PageID.80-81.) He took Naproxen, Percocet "for breakthrough pain," and Methadone twice per day. (*Id.*, PageID.80.) Zibble guessed that the Methadone and Percocet caused dizziness, lightheadedness, and nausea "because those are the newest ones that I'm on, and it wasn't this bad before." (*Id.*, PageID.81-82.) If he "absolutely 100% had to, [he] probably could occasionally" drive while taking those medications, "but . . . I don't like to," he added. (*Id.*, PageID.82.) At most, the medications "take a little bit of the edge off where you can try and do something." (*Id.*)

His medication regimen also included Imitrex for his debilitating migraines. (*Id.*, PageID.82-83.) Once he felt a migraine forming, he would pop an Imitrex "and it might work, and it might not. Sometimes it works. Sometimes it doesn't." (*Id.*) If it didn't, Zibble retreated to a "dark, quiet room because I just, the pain is there. I can't move. I'm sick to my stomach. If I get up and try to move, I feel like I'm going to pass out." (*Id.*, PageID.83.)

Zibble's wife also testified. (*Id.*, PageID.91.) Since her husband had become disabled, the brunt of the housework fell to her: "I have to mow now . . . . I have to do all the lifting, all the laundry. All the cooking I do. I have to help him sometimes get his coat on, get his shirt off." (*Id.*, PageID.92.) During shopping trips, Zibble would "like to pick things up when he likes to, but he can't," so "I do it," his wife explained. (*Id.*) "I load the cart. I load the vehicle. I load them in the house, and I put them away." (*Id.*) She also preferred to drive—but no matter who was behind the wheel, he couldn't sit for long and

11

so they needed to take multiple breaks. (*Id.*, PageID.92-93.) Regarding problems induced by the medications, she noticed "[h]e like ozones [*sic*], and then two minutes later he could be snoring, and he's not even aware that he falls asleep." (*Id.*, PageID.93.)

Finally, the vocational expert (VE) testified. (*Id.*, PageID.94.) The ALJ asked the VE to describe Zibble's past relevant work as a salesperson. (*Id.*, PageID.96.) According to the Dictionary of Occupational Titles (DOT), the VE stated, a sales representative position has a Specific Vocational Preparation (SVP) of five, (*id.*), meaning it would take the typical worker anywhere from six months to a year to learn. DOT, *Appendix C–-Components of the Definition Trailer*, 1991 WL 688702 (4th ed., 1991). As the VE explained here, an SVP-5 is "skilled work." (R. 11, PageID.96.) Although the sales-representative is generally "light work," the VE noted that Zibble had performed it at "a very heavy work" level because he had to lift kegs. (*Id.*) The VE then analogized Zibble's ownership of the party store to a "retail store manager" position, which was light work with an SVP of seven (*i.e.*, taking between two to four years to acquire the necessary skills). (*Id.*); *see also* DOT, *Appendix C*, 1991 WL 688702.

Next, the ALJ asked the VE to

assume an individual [with] the claimant's age, education, and work experience. Can perform work at the light exertional level. Assume that the individual can frequently handle and finger with both upper extremities. Assume that individual can frequently push or pull, and reach overheard with the right upper extremity. Assume that the individual can frequently push or pull, operate foot controls with the lower extremities. Assume that individual can frequently balance. Can occasionally kneel, crouch, stoop, and crawl. Can occasionally climb stairs and ramps. Can never climb ladders, ropes, and scaffolds, and never be exposed to vibrations, unprotected heights, and moving machinery parts.

(*Id.*, PageID.97.) Would the individual be able to perform the claimant's past relevant work, either as it was actually performed or as those occupations were generally performed in the national economy? (*Id.*) Yes, the VE replied; at the light work level, the individual could perform the retail store manager position and the sales representative position. (*Id.*, PageID.97-98.) In addition, the individual could perform other jobs: cashier (1.3 million positions nationally); office helper (333,000 positions); and factory job, "inspection type work" (135,000 positions). (*Id.*, PageID.98-99.) If the individual could only occasionally push, pull, or reach overhead, "most of the past relevant work jobs would be eliminated," as would the cashier and office helper positions; the factory inspector job remained, but the number of available positions would drop by half. (*Id.*, PageID.101-02.) And if the person could lift only 5 pounds with one arm, and 10 with the other, the number of inspector positions would plummet by half again. (*Id.*, PageID.103.)

The ALJ then asked the VE to consider the same individual in the hypothetical above with the following additional limitations: "able to understand, and remember simple instructions, make simple work-related decisions, and carry out simple instructions." (*Id.*, PageID.99.) Those restrictions, the VE testified, would limit the individual to unskilled positions, thus eliminating Zibble's past relevant work. (*Id.*) But the individual could still perform the other jobs the VE had listed: cashier, office helper, and factory inspector. (*Id.*, PageID.100.)

The ALJ then posed a third hypothetical: suppose an individual with all the restrictions above would also be off task at least 20 percent of the workday and miss two or more days a week. (*Id.*) These limitations precluded work. (*Id.*)

13

At the very end of the hearing, Zibble's attorney noted his many physical issues but said "the killer is also the medications that he requires just to make it through the day between the Percocet, and before that the Vicodin, and now adding to that the methadone, and just that would prevent him from doing any type of job on a sustained basis, just that alone." (*Id.*, PageID.101-04.)

**F.  Law and Analysis**

Zibble offers three reasons to vacate the Commissioner's decision: (1) the ALJ failed to consider his narcotic medications' side effects; (2) the ALJ misrepresented Zibble's activities of daily living; and (3) the ALJ's assessment of Dr. Papenfuse's opinion ignored the opinion's statement that one of Zibble's medications, methadone, caused sedation.[2] I will address each argument in turn.

**1.  The ALJ's Evaluation of Zibble's Symptoms**

Zibble's first and second arguments attack the ALJ's assessment of his symptoms, which are defined as the claimant's "own description of [his or her] physical or mental impairment." 20 C.F.R. § 404.1502(i).  In general, a two-step inquiry governs this analysis. The ALJ must first determine whether an "underlying medically determinable physical or mental impairment(s) . . . could reasonably be expected to produce an individual's symptoms, such as pain." 16-3p, 2016 WL 1119029, at *3 (Mar. 16, 2016). Second, the "intensity and persistence of those symptoms" are examined "to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.*;

---

[2] I have reordered the sequence of arguments because the first and second above both relate to the ALJ's evaluation of Zibble's symptoms and thus should be paired.

14

*see generally* 20 C.F.R. § 404.1529. In the second step, the ALJ considers a host of factors, including the claimant's "daily activities" and "[t]he type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms." 20 C.F.R. § 1529(c)(3)(i), (iv).

### a. Medication Side Effects

Zibble argues that the ALJ failed to consider his medications' side effects under 20 C.F.R. § 1529(c)(3)(iv), which in turn led the ALJ to bungle the step-four determination that he could perform his past relevant work. (*Id.*, PageID.689.)[3] He recounts his hearing testimony and application reports (all of which were described above) stating that his medications caused dizziness, sleepiness, and nausea. (R. 14, PageID.687-88.) Then, he contends the ALJ failed to "make findings regarding the amount (dosages) of medications"

---

[3] Zibble launches his argument with a one-sentence paragraph that appears disconnected from everything that follows. He opens, "Since a 'severe' impairment by its very nature *significantly* limits a person's ability to perform basic work activities, it logically follows there must be some restriction associated with these 'severe' mental impairments so that the RFC will accurately portray the limitations of that particular claimant." (*Id.*, PageID.686, citing *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).) There are many problems with this statement. Most glaringly, it is irrelevant to whether Zibble's medications produced side effects. The medications were not deemed a "severe" impairment that, under Zibble's view, must necessarily be accompanied by functional limitations. Perhaps Zibble means that his pain was a severe impairment or closely associated to one, as he goes on to quote records containing his complaints of pain. (*Id.*, PageID.686-87.) But even if Zibble's logic above were valid, it would not follow that a severe impairment producing pain must result in restrictions from the side effects of medications used to treat the impairment.

All of this supposes that Zibble's statement is legally correct. It is not. *Varley* actually upheld the ALJ's credibility assessment based in part on the argument that "although the physicians and psychologists diagnosed a severe, chronic condition, the examination results do not document functional debilitation." 820 F.2d at 779-80. If anything, then, *Varley* stands for the opposite of what Zibble contends. In any case, the Sixth Circuit has elsewhere put Zibble's argument to rest. A finding of severity at step two merely means an impairment imposes "more than a minimal effect" on the ability to work, the court explained in *Griffeth v. Comm'r Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007). Such a finding is consistent with a further determination that the impairment "has 'little effect' on the claimant's ability to perform basic work related activities." *Id.* "'A claimant's severe impairment may or may not affect his or her functional capacity to do work. One does not necessarily establish the other.'" *Id.* at 429 (citation omitted). Thus, even if Zibble's opening salvo were relevant to his argument, it would fail.

he took and to evaluate his testimony or written comments on this topic; the only relevant discussion in the ALJ's decision simply mentioned dizziness and noted Zibble did not complain of side effects from diabetes medications. (*Id.*, PageID.689-90.) But, according to Zibble, this ignored the "consistent theme" in the record "of drowsiness/dizziness affecting balance." (*Id.*, PageID.690.)

From this point, Zibble shifts his attention to how the ALJ's inadequate analysis affected the step-four determination that he could perform his past relevant work. (*Id.*, PageID.690-92.) Most of this discussion, however, block quotes other sources. As to his case, Zibble notes that the ALJ made only "a conclusory finding that based on the vocational expert testimony and review of the record," he could manage the requirements of his past jobs. (*Id.*, PageID.690.) The only relevant statements in Zibble's brief are as follows:

> In this case, the absence of how the claimant's narcotic medications affect his ability to perform skilled work at an SVP (Specific Vocational Preparation) of five and seven, which are skilled jobs. This type of work requires high levels of judgment and adaptability, understanding, carrying out and remembering complex instructions and encompassing abstract ideas and problem solving. (POMS: DI 25001.001 (75.Skilled work).

(*Id.*, PageID.692.)

Although the ALJ's decision is not perfect, I find Zibble's argument unpersuasive. As a global matter, an ALJ need not cite every piece of evidence in a record to show that he or she considered it. *Kornecky v. Comm'r of Soc. Sec.,* 167 F. App'x. 496, 507-08 (6th Cir. 2006) ("[I]t is well settled that[ ] 'an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'"). Here,

while the ALJ did not laboriously repeat Zibble's subjective complaints concerning medications, he did note the narcotic prescriptions and balance issues, as well Mrs. Zibble's testimony and pre-hearing report mentioning dizziness. (R. 11, PageID.52.) The ALJ also properly observed that Zibble did not complain of side effects from his diabetes medication. (*Id.*, PageID.53-54, 486.)

At the same time, however, the ALJ explained that Zibble's complaints were unpersuasive because, among other things, they were inconsistent the "lack of side effects from medication." (R. 11, PageID.53.) Had the ALJ meant to say there were no allegations of side effects whatsoever, he would have been mistaken, as Zibble did make such complaints at the hearing and in his report. *See, e.g.*, (*Id.*, PageID.80, 275-77.) But it appears that the ALJ's general characterization about side effects related to the diabetes medication, which the ALJ later discussed twice in the decision. (*Id.*, PageID.53-54.)

In any event, the record contains scant evidence the ALJ could have cited and discussed to illuminate Zibble's side effects. *Cf. Essary v. Comm'r of Soc. Sec.*, 114 F. App'x 662, 667 (6th Cir. 2004) ("Although Essary testified that she suffered from dizziness and drowsiness as a result of her medications, Essary's medical records make no indication that Essary reported such side effects to any of her physicians. Thus, based on the record before him, the ALJ did not err in finding that Essary suffered no adverse side effects from her medications."). As noted above, his adult function report claimed that pain and his medications affected his ability to follow instructions, his concentration, and his memory. (*Id.*, PageID.275.) But the ALJ addressed these issues, describing evidence that Zibble's memory and attention were normal, that he understood his doctors' explanations, and that

17

he had denied memory or concentration problems. (*Id.*, PageID.49-50 (citing *id.*, PageID.359, 366,[4] 381, 601, 612, 615, 628).) Other medical records further support the ALJ's conclusion. *See, e.g.*, (*Id.*, PageID.360 (finding normal mood and affect), 368 (finding normal orientation, mood, speech, thought, and attention), 388 ("[m]entation appropriate"), 393 (same), 395 (same), 398 (same), 482 (same), 484 (same), 486 (same), 632 (denying decrease in concentration, no confusion, and no memory loss); *see also id.*, PageID.385 ("[m]entation quiet"), 390 ("[m]entation appropriate but very difficult to keep him on subject").) The decision also relies on the evaluation of Dr. Barbara Jones Smith, who reviewed the evidence and found that Zibble had only mild difficulties in concentration, persistence, or pace. (*Id.*, PageID.51 (citing *id.*, PageID.112).)

Elsewhere in his function report and again at the hearing, Zibble mentioned dizziness as another side effect. (*Id.*, PageID.81-82, 277.) The ALJ adequately grappled with Zibble's dizziness, which also stemmed from his neuropathy. For instance, the ALJ observed that Zibble used a cane and had also complained of balance troubles to his doctor. (*Id.*, PageID.54-55 (citing *id.*, PageID.671).) But the ALJ countered this with other evidence of "neurological findings stat[ing] that the claimant did not have any difficulty with balance . . . [or] motor disturbances," and also the lack of records indicating that his cane was prescribed by a doctor. (*Id.* (citing *id.*, PageID.628).) Even so, the ALJ explained that the RFC's limitations accommodated these complaints. (*Id.*, PageID.55.)

---

[4] The ALJ cited PageID.365, but the relevant evidence is on the following page.

The record provides substantial support for the ALJ's analysis of Zibble's dizziness. Aside from finding pain on a few occasions, many physical examinations revealed no abnormalities in his strength, gait, or reflexes. *See* (*Id.*, PageID.394, 437, 499, 601, 605, 612, 617, 619, 622, 628, 633, 648; *see also* (*id.*, PageID.359-60 (no abnormalities reported in less extensive testing), 386 (some positive neuropathy findings but normal gait); 391 (same), 396 (same), 429 (no abnormalities in less extensive testing), 432 (same), 485 (same), 487 (some positive neuropathy findings but normal gait), 489 (same), 666-67 (tenderness in back, decreased reflexes, but normal strength and gait).) Even examinations that produced some abnormal findings were largely normal. *See* (*Id.*, PageID.367-68 (decreased reflexes, mild kyphosis, and decreased left lateral bending in cervical spine; otherwise normal), 465 (finding knee tenderness and mild effusion but normal range of motion and otherwise unremarkable), 468-69 (same), 471-72 (same), 496-97 (same), 656 (same).) In light of this evidence, the ALJ did not err by finding that Zibble's complaints of dizziness were inconsistent with the medical record.

This leaves two alleged side effects: drowsiness and nausea. It is true that the ALJ did not directly address either of these conditions as side effects of medication. Nonetheless, the ALJ did examine the sufficiency of Zibble's sleep when discussing his apnea. (*Id.*, PageID.55.) As the ALJ noted, Zibble was diagnosed with "mild obstructive apnea" in October 2014. (*Id.*, PageID.443.) Around that time he took 5 to 7 naps a week, lasting roughly 30 minutes each. (*Id.*, PageID.437.) Subsequently, the ALJ explained, he received a CPAP machine, which improved his sleep quality and his "daytime sleepiness." (*Id.*, PageID.55 (citing *id.*, PageID.428, 431).) Sleep studies demonstrated the

19

improvements, and Zibble confirmed that the CPAP helped, telling another doctor that he "sees the difference now in how much he feels better." (*Id.*, PageID.381, 441-42.) Later still, Zibble continued to report "improvement in sleep quality and daytime sleepiness." (*Id.*, PageID.428.) In fact, despite some difficulty sleeping due to neck pain, he estimated that he needed only one 30- to 45-minute nap each week if his sleep was disturbed the night before. (*Id.*) A few other medical reports mention his fatigue, but none suggested it resulted from medications. (*Id.*, PageID.385, 390, 627.) And in one of the later medical reports, the doctor wrote, "no oversedation noted." (*Id.*, PageID.667.) Thus, the evidence was inconsistent with Zibble's complaints of fatigue, and the ALJ properly addressed the matter. As for Zibble's nausea, the few times he mentioned it to doctors he did not suggest it resulted from medications. *See* (*Id.*, PageID.390, 671.)

Another problem with Zibble's argument is that he does not state how the RFC should have been amplified to accommodate the medications' side effects. *See Essary*, 114 F. App'x at 667 (rejecting plaintiff's argument because she "failed to present evidence of any functional limitations resulting specifically from her obesity"). He does not, for example, attempt to show that his nausea would take him off task often enough to preclude work. Nor does he disclose how the RFC's limitations are inadequate to account for his dizziness. The same goes for his drowsiness. Even pre-CPAP, his napping needs—a 30-minute nap 5 to 7 times per week, (*id.*, PageID.437)—appeared conformable to a work schedule.

Finally, Zibble's digression about the ALJ's step-four finding adds no independent ground to reverse. It appears, rather, to be premised on the ALJ's having formulated an

incomplete hypothetical for the VE. But Zibble does not say what limitations an accurate hypothetical would have included that the ALJ's didn't. Apparently, he thinks that the side effects impede his ability to maintain the skills needed for his past jobs. (R. 14, PageID.692.) Again, he offers no justification for this conclusion. And I will not hazard any guesses on how, for example, queasiness affects problem-solving skills.

The rest of his argument on this point consists of quotes from *Bailey v. Comm'r of Soc. Sec.*, concerning SSR 82-62. 173 F.3d 428, 1999 WL 96920, at *4 (6th Cir. 1999). That Ruling requires that a step-four finding that a claimant can complete past work be justified based on the individual's statements and other evidence. *Id.* But Zibble does not discuss how the ALJ breached this Ruling; to the extent he means to suggest the medication side effects preclude him from his past work, his argument fails for the reasons above.

### b.  Zibble's Activities of Daily Living

Zibble next argues that the ALJ misrepresented his daily activities, which as noted above are a factor when assessing symptoms. 20 C.F.R. § 1529(c)(3)(i). He first quotes the ALJ's statement that "except for needing some assistance with personal care activities, he is able to perform his personal care activities independently." (R. 14, PageID.695 (quoting R. 11, PageID.53).) The ALJ went on to say,

> In addition, the claimant reported that he is able to prepare his own meals, fold laundry, go shopping, and pay his own bill. Exhibit 6E:3-4. The claimant also reported that he enjoys woodworking, fishing, and hunting. Exhibit 6E:5; *See also* Exhibit 16F:5. The claimant confirmed with his testimony that he continues to do some woodworking. This full range of activities of daily living does not support the claimant's allegations about the severity of his physical symptoms.

(R. 11, PageID.53.)

21

Zibble attempts to pick apart this analysis. He notes that, regarding personal care, his function report indicated problems putting clothes over his head and shoulders, managing haircare, and putting on his shoes. (R. 14, PageID.696 (citing R. 11, PageID.271).) As for his hobbies, he wrote that he only did woodworking and could no longer hunt or fish without having to "stop and start later all the time." (*Id.*, PageID.696-97 (quoting R. 11, PageID.274).) Moreover, he points out, he testified that woodworking proves difficult for him, as neuropathy deprives his fingers of feeling and leads to mishaps. (*Id.*, PageID.697-98.) According Zibble, the ALJ also ignored that meal preparation took double the time it used to, he could fold only small items, he appreciated encouragement to complete daily tasks, and, per his wife's testimony, he could not lift objects while shopping, load them into the cart or car, or put them away at home. (*Id.*, PageID.696-97 (citing R. 11, PageID.92, 272-73).) Even if these misrepresentations were slight, Zibble concludes, the daily activities were minimal and do not support the ALJ's finding. (*Id.*, PageID.699 (citing *Rogers*, 486 F.3d at 248-49).)

The ALJ's analysis was more nuanced then Zibble suggests. For example, it recounted Zibble's testimony about woodworking, noting the accidents his numb fingers had caused. (R. 11, PageID.52.) The ALJ also assessed Mrs. Zibble's testimony concerning her husband's lifting restrictions, finding that her statements clashed with the medical evidence demonstrating Zibble's undiminished strength. (*Id.*, PageID.55-56.) Substantial evidence, noted above, supports the ALJ's conclusion on this point, as physical examination results did not reveal strength deficits. And Zibble did write that he could shop when necessary; his lone qualification was that the length of his trips differed depending

on how he felt. (*Id.*, PageID.273.) The ALJ did not misrepresent these assertions, nor was he required to credit Mrs. Zibble's testimony over her husband's statements given the lack of medical support for her testimony.[5]

The ALJ also properly characterized Zibble's personal care activities. If anything, the ALJ slightly expanded the alleged limitations by noting generalized struggles with all overhead reaching and bending. (*Id.*, PageID.53.) Zibble's report was more specific, stating he needed help putting clothes over his neck and shoulders, caring for his hair, and putting on his shoes. (*Id.*, PageID.271.)

As for folding laundry, it's unclear whether Zibble's brief accurately characterizes his function report. He quotes it as saying, "folding laundry if on table, small things as long as not reaching overhead or bending over." (R. 14, PageID.696 (quoting R. 11, PageID.272.) But it is questionable whether the entire line refers to folding clothes. Zibble's brief places comma after "table," but in the report it looks more like a period to me, separating his folding from the other "small things" he can do around the house. The inconsistent capitalization doesn't clarify matters.[6] Another reason to believe that the entire line does not refer to folding is because just a month before completing the form he had

---

[5] The ALJ could have noted other inconsistencies between her statements and the record. Her January 2016 function report stated that Zibble could no longer do home repairs and was limited in yardwork. (*Id.*, PageID.259-60.) But a month earlier, Zibble had reported he was "working around the house, [and] finds this to be 'alright.'" (*Id.*, PageID.397.) A few months later, a medical report stated, "Not sure if he is getting much exercise but wife assures he is doing things outside." (*Id.*, PageID.485.) While the ALJ did not discuss this evidence, he was not obliged to cite every piece of evidence. *Kornecky*, 167 F. App'x. at 507-08. Still, because the ALJ did not broach the topic of house- or yardwork, I will not rely on this evidence in the analysis above.

[6] The sentence appears as follows: "folding LAUNDY If ON TABle. SMALL Things AS Long AS NOT REACHing OVER HEAd OR BENdING OVER[.]" (R. 11, PageID.272.)

23

told a medical provider that he had been "working around the house, [and] finds this to be

'alright.'" (*Id.*, PageID.397.) Also, his wife's function report did not contain the additional

restrictions, instead noting only that "[h]e folds laundry if I put it on the table." (*Id.*,

PageID.260.) It is true, however, that both he and his wife claimed it took him longer than

normal. (*Id.*, PageID.260, 272.)

Thus, it appears that the ALJ did not capture the complete picture on folding. But

he observed that Zibble struggled with overhead reaching and bending. Any parts the ALJ

left out—like needing a table, taking longer, and perhaps being limited to folding "small

things"—are not such significant qualifications on Zibble's ability to fold that the ALJ's

decision was fundamentally inaccurate.

Regarding Zibble's need for "encouragement" when doing housework, he simply

stated that it helped because he became frustrated. (*Id.*, PageID.272.) Similarly, on the same

spot in her form, Zibble's wife merely noted he liked "companionship." (*Id.*, PageID.260,

272.) Neither stated he needed help (aside from his wife placing the clothes on the table)

or even that encouragement was a prerequisite to him completing the work.

Zibble comes slightly closer to the mark when regarding the ALJ's assessment of

his fishing, hunting, and cooking. (R. 11, PageID.53.) Zibble's function report stated that

he did not fish or hunt "much at all," and when he did he would need to start and stop. (*Id.*,

PageID.274.)[7] Nonetheless, both Zibble and his wife suggested that he continued these

activities, even if infrequently and fitfully. (*Id.*, PageID.262, 274.) Regarding cooking, the

---

[7] The report said the same of woodworking, but Zibble's testimony elaborated on that hobby and the ALJ
analyzed those more detailed statements.

ALJ did not acknowledge two limitations Zibble claimed in the function report: it took "twice as long" and he could not finish a complete meal "at one time." (*Id.*, PageID.272.) But aside from these restrictions, both Zibble and his wife admitted he prepared meals on a daily basis, including microwavable dishes, sandwiches, and crockpot dinners. (*Id.*, PageID.260, 272.) In other words, the restrictions did not greatly impair Zibble's culinary life.

In short, then, the ALJ's treatment of the vast majority of daily-activity evidence was correct. The few wrinkles he left out regarding hunting, fishing, and cooking—and perhaps folding—are not enough to call the ALJ's findings into question. Being able to fold *with* a table is not so different from being able to fold without one. In a similar vein, that Zibble might need longer in the kitchen or while fishing and hunting does not fatally undercut the ALJ's decision. And in addition to the above evidence, the ALJ's analysis also relied on Dr. Jones's opinion, which found only mild restrictions in Zibble's daily activities. (R. 11, PageID.50 (citing *id.*, PageID.112).)

Finally, I am unswayed by Zibble's fallback argument that his activities do not demonstrate an ability to work. True, numerous cases support the basic proposition "that the ability to complete quotidian activities like personal care and driving does not signify the claimant is capable of a full day's work." *Cooper v. Comm'r of Soc. Sec.*, No. 4:13–cv–11883, 2014 WL 4606010, at *17 (E.D. Mich. June 17, 2014) (collecting cases), *Rep. & Rec. adopted by* 2014 WL 4607960 (E.D. Mich. Sept. 15, 2014). Thus, heavy reliance on the claimant's day-to-day tasks could constitute error. Yet, the regulations require

consideration of daily activities and thus ignoring them would be error. 20 C.F.R. § 404.1529(c)(3)(i).

As such, a normal daily routine might lend some support to an ALJ's rejection of benefits, but it isn't highly probative and shouldn't be overemphasized. *See Neal v. Comm'r of Soc. Sec.*, No. 18-10709, 2019 WL 2208555, at *11 (E.D. Mich. Jan. 31, 2019), *Rep. & Rec. adopted by* 2019 WL 1306162 (E.D. Mich. Mar. 22, 2019). When the ALJ considers daily activities "with care," along with other, more telling factors, courts have upheld the analysis. *See id.* at *11 (quoting *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013)). By contrast, in the case Zibble cites, the ALJ emphasized and misrepresented the claimant's daily activities, and also erred in the rest of his assessment of the claimant's symptoms. *Rogers*, 486 F.3d at 248-49.

The present case is not like *Rogers*. Daily activities were just one piece of the ALJ's analysis. Zibble doesn't quibble with the other rationales, the most important of which was the objective medical evidence. *See* 20 C.F.R. § 404.1529(c)(3) ("The information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living) is also an important indicator of the intensity and persistence of your symptoms."). The ALJ noted that despite a few deficient sensory findings, the physical examination results displayed normal strength and gait, as discussed above. (R. 11, PageID.53.) Regarding Zibble's cervical spine problems, the ALJ cited a doctor's recent recommendation to continue with pain medication rather than undergo surgery or other

26

more intensive treatments. (*Id.* (citing *id.*, PageID.648).) The ALJ correctly labeled this course of treatment as "conservative." *See Rogers v. Comm'r of Soc. Sec.*, No. 4:18-cv-10561, 2019 WL 490384, at *22 (E.D. Mich. Jan. 7, 2019), *Rep. & Rec. adopted by* 2019 WL 480374 (E.D. Mich. Feb. 7, 2019). Further, aside from some tenderness and mild effusion, Zibble's knee examinations returned normal results. (R. 11, PageID.465, 468-69, 471-72, 496-97, 503, 656.)

Thus, despite a few missing details in the decision, the ALJ neither misrepresented Zibble's daily activities nor placed undue weight on them. In addition, the analysis properly engaged other factors to assess his symptoms.

### 2. Dr. Papenfuse's Opinion

Like his first argument, Zibble's final contention concerns somnolence. (R. 14, PageID.693-94.) Specifically, he points out that the ALJ's "[d]ecision unwittingly gives 'great weight' to the Medical Source Statement of the latest pain management physician, Dr. Papenfuse," but that opinion "indicated that Methadone causes 'sedation.'" (*Id.*, PageID.693.) Since the ALJ gave "great weight" to Dr. Papenfuse's opinion overall, Zibble contends that "'great weight' should also be applied to the fact that Methadone causes sedation." (*Id.*, PageID.694.)[8]

---

[8] In a brief paragraph tucked into the middle of his argument, Zibble adds that "[t]his is a significant conflict that the ALJ has completely ignored," (*id.*, PageID.693), violating his duty under SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996), to consider and resolve "material inconsistencies" in the evidence. It's unclear which "conflict" Zibble means. It is not a conflict within Dr. Papenfuse's opinion: Zibble suggests that the opinion is internally consistent, since "sedation from Methadone . . . is separate from the . . . ability to work on a regular and sustained basis." (R. 14, PageID.694.) The only conflict Zibble attempts to sketch is between Dr. Papenfuse's line about sedation and the ALJ's placing great weight on the medical opinion. But that is not an inconsistency in the evidence itself. Rather, it simply represents a piece of evidence that,

A physician like Dr. Papenfuse can provide medical opinions, which are statements regarding "the nature and severity of [the claimant's impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite the impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).[9] The ALJ must use a six-factor balancing test to determine the probative value of these medical opinions. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c).

Dr. Papenfuse's statement appears on a one-page, preprinted form he filled out on October 18, 2017. (R. 11, PageID.640.) In it, he listed four diagnoses: spondylolisthesis, cervical; radiculopathy, cervical; other cervical disc displacement; and cervicalgia. (*Id.*) The objective signs of these impairments included reduced range of motion in the neck at the C5-6 cervical disc level, and pain in the neck and left arm. (*Id.*) Zibble's diabetes could "complicate his condition" because it "may lead to neuropathy," Dr. Papenfuse observed. (*Id.*) The disputed statement appeared in response to the following form question: "Identify the side effects of any MEDICATIONS that may have implications for working, e.g.,

---

in Zibble's view, cuts against the ALJ's finding. Thus, Zibble's discursion on SSR 96-8p is just another way of arguing that the ALJ should have paid more attention to the line about sedation.

[9] Various amendments have occurred after the claim was filed. *See, e.g.*, *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). The governing regulation here, however, expressly applies to claims filed before March 27, 2017, as Zibble's was. *See* 20 C.F.R. § 404.1527.

dizziness, drowsiness, reduced concentration, nausea, ect." (*Id.*) In answer, Dr. Papenfuse wrote, "Methadone - sedation." (*Id.*) Nonetheless, Dr. Papenfuse ended by opining that Zibble needed no unscheduled breaks during an eight-hour workday and was not in "off-work status." (*Id.*)

The ALJ gave Dr. Papenfuse's opinion "great weight" because it was "consistent with the overall record." (*Id.*, PageID.55.) As an example, the ALJ noted that the opinion's rejection of unscheduled work breaks was supported by evidence "showing the claimant had full strength in all muscle groups." (*Id.* (citing *id.*, PageID.601, 612).) Further demonstrating the consistency between the opinion and the record were medical reports showing Zibble was "in no acute distress and walked with a normal gait." (*Id.* (citing *id.*, PageID.628, 633, 666).)

To make his case, Zibble must somehow square Dr. Papenfuse's ultimate conclusions about his ability to work with the comment about sedation. The most natural interpretation, however, is that Dr. Papenfuse determined that while Methadone had the *potential* to sedate, Zibble could still maintain work without requiring unscheduled breaks. Most significantly, the notation about Methadone merely indicated a possible side effect. Dr. Papenfuse never claimed that Zibble was experiencing that effect—and for good reason, because despite Zibble's complaint of fatigue to Dr. Papenfuse, (*id.*, PageID.665), he never linked the complaint to his medications and the doctor found "no oversedation," (*id.*, PageID.667.) On many other visits to Dr. Papenfuse, Zibble made no complaints of fatigue. *See* (*Id.*, PageID.358-72; *but see id.*, PageID.671 (complaining of fatigue, but not suggesting it was due to medications).)

Thus, Dr. Papenfuse's statement on sedation merely posed a possibility—or from a different light, a medical fact, *i.e.*, that Methadone can cause fatigue—and not a functional limitation. And to the extent Dr. Papenfuse meant to suggest that Zibble experienced this effect, he nonetheless concluded that any limitation would neither bar Zibble from work nor require unscheduled breaks. Consequently, the ALJ could appropriately place "great weight" on the opinion without having to account for the note about sedation.

Zibble offers two brief and unpersuasive arguments to circumvent Dr. Papenfuse's ultimate conclusions. First, he suggests that "sedation from Methadone in addition to the other medications Mr. Zibble takes is separate from the . . . ability to work on a regular and sustained basis. It certainly would affect the RFC and his ability to perform walking, bending and balance problems [*sic*] Mr. Zibble experiences." (*Id.*, PageID.694.) It is difficult to follow this line of thought. It appears to posit that sedation has nothing to do with the ability to sustain full-time employment. Proving that, however, would be a pyrrhic victory for Zibble: it would explain away Dr. Papenfuse's troublesome conclusions at the cost of showing sedation is no impediment to work, which is the bedrock argument here. Perhaps sensing the futility of his suggestion, he speculates that sedation would instead hinder other abilities such as walking, bending, and balancing. But he never hinted that the medications caused drowsiness that in turn led to wobbly walking or precarious bending. His elaborate dishwashing routine, for example, was to avoid dizziness, not dozing off. (*Id.*, PageID.88-89.) And as shown above, the ALJ addressed the relevant evidence and adequately calibrated the RFC to account for Zibble's dizziness and walking difficulties. Zibble has not demonstrated the need for a more restrictive RFC.

30

Zibble's second approach to Dr. Papenfuse's conclusions is to note his own hearing testimony that the doctor told him "he could not . . . mark that [*i.e.*, the off-work status] because he wasn't the wasn't the one who put me off of work." (R. 14, PageID.694 (quoting R. 11, PageID.87).) The implication is that Dr. Papenfuse's opinion did not reflect his medical judgment. But Zibble does not pursue this argument or provide any reason to doubt the sincerity of the medical opinion. Without more, any assessment of Dr. Papenfuse's underlying rationale is pure speculation.

### G. Conclusion

For these reasons, I conclude that substantial evidence supports the ALJ's decision. Consequently, I recommend **DENYING** Zibble's Motion, (R. 14), **GRANTING** the Commissioner's Motion, (R. 15), and **AFFIRMING** the Commissioner's final decision denying benefits.

## III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have

to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  July 23, 2019                        S/ PATRICIA T. MORRIS
                                            Patricia T. Morris
                                            United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: July 23, 2019                        By s/Kristen Castaneda
                                           Case Manager